# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**JAMES R. GIBSON and**
**TAMARA ROHR,**

               **Plaintiffs,**

      **v.**                                 **Case No. 12-C-657**

**MILWAUKEE COUNTY,**
**et al.,**

               **Defendants.**

---

## DECISION AND ORDER

In this case, two corrections officers formerly employed by the Milwaukee County Sheriff's Department allege violations of the Americans With Disabilities Act ("ADA") and the Family and Medical Leave Act ("FMLA"). The defendants are Milwaukee County, the Milwaukee County Sheriff's Department, and Sheriff David A. Clarke, Jr., who is sued in his official capacity. Before me now is the defendants' motion for summary judgment.

## I. BACKGROUND

At the times relevant to this suit, both plaintiffs, James Gibson and Tamara Rohr, suffered from conditions that required them to take significant amounts of leave from their employment as corrections officers with the Milwaukee County Sheriff's Department. The plaintiffs allege that when they returned from leave and asked the Sheriff's Department to accommodate certain work restrictions imposed by their doctors, it refused to do so. Instead, the Department required the plaintiffs to take additional leave until they could return to work with no restrictions. Each plaintiff alleges that the Department's actions amounted to a denial of a reasonable accommodation under the ADA. The plaintiffs also

allege that the Sheriff's Department retaliated against them for exercising their rights under the Family and Medical Leave Act.

## A.    Facts Relating to James Gibson

Gibson began working for the Sheriff's Department as a corrections officer in 2008. On July 24, 2011, Gibson was appointed to the rank of Corrections Lieutenant through a procedure known as Temporary Appointment to a Higher Classification, or "TAHC." This procedure is based on a Milwaukee County ordinance that allows employees to be temporarily appointed to vacant positions. See Milwaukee County Ord. § 17.085. The temporary appointment lasts for an initial 90-day period and may be extended for an additional 90-day period. Id. Appointments lasting longer than 180 days must be approved by the County Board. On October 19, 2011, Gibson's appointment to Corrections Lieutenant was extended for a second 90-day period, thus exhausting the time he could be appointed to that position without approval from the County Board.

On November 15, 2011, Gibson began to experience severe migraine headaches. He sought medical care the next day, and on the advice of his physician he decided to take leave from work under the Family and Medical Leave Act until January 1, 2012. On December 29, 2011, Gibson informed the Sheriff's Department that he would return to work on January 2, 2012, but with a restriction that prevented him from working more than eight hours per day. After receiving this notice, the Department scheduled Gibson to work on January 5, 2012. Gibson reported to work that day and for the next several days. However, on January 9, 2012, Gibson was informed that he was required to attend a meeting the next day that would require him to work more than eight hours in one day. It turned out that when the Department restored Gibson to work following his leave, it

overlooked his eight-hour restriction. When Gibson called the restriction to the Department's attention on January 9th, the Department informed him that he would not be allowed to return to work until his eight-hour restriction was lifted. Gibson then took additional FMLA leave from January 10, 2012 to February 16, 2012. While he was on leave, Gibson's TAHC appointment to Lieutenant was renewed for a second time, even though the County Board had not approved the extension of his appointment beyond 180 days.

On February 17, 2012, Gibson returned to work without any restrictions and worked without incident until March 7, 2012. On that day, Gibson fell down a flight of stairs due to dizziness and lack of balance caused by his migraine headaches. The following day, Gibson's doctor reinstated his eight-hour work restriction. Once again, the Sheriff's Department refused to allow Gibson to work with this restriction in place, and thus Gibson was required to take additional FMLA leave.

On March 30, 2012, Gibson informed the Department that he would be returning to work with no restrictions on April 13, 2012. The Department scheduled him to work on April 14, 2012, and Gibson returned to work that day. On April 18, 2012, Gibson's TAHC appointment to lieutenant was renewed for a third time. However, on that same day, Gibson's supervisor informed him that it was documenting that Gibson had three unexcused absences during November 2011 and March 2012. Gibson then spoke to various supervisors and informed them that the supposedly unexcused absences were days when he was on FMLA leave. A few hours after Gibson spoke to his supervisors, he was informed that his TAHC appointment to Lieutenant was being rescinded. Gibson received formal notice of this action on April 20, 2012.

After his TAHC was rescinded, Gibson continued to work as a corrections officer. Gibson contends that at this point he began to receive assignments that required less skill than the assignments he had received before he was temporarily appointed to lieutenant. On November 9, 2012, the Department transferred Gibson from his assignment at a correctional facility located in downtown Milwaukee to a correctional facility in Franklin, which is located in the southern part of Milwaukee County. (Following the parties' usage, I will refer to the jail located in Franklin as the "South facility"). Gibson contends that corrections officers widely regarded a transfer to the South facility as a form of punishment or as a demotion.

In January 2013, Gibson accepted a security position with a private company and left his employment with the Sheriff's Department.

## B.    Facts Relating to Tamara Rohr

Rohr began working for the Sheriff's Department as a corrections officer in 2008. That same year, she began experiencing symptoms associated with an autoimmune disorder. Her symptoms required her to take FMLA leave at various times throughout her employment with the Department.

In early January of 2012, Rohr had to take FMLA leave to recover from surgery. The Sheriff's Department initially refused to credit Rohr with FMLA leave for this time and documented her time off as a series of unexcused absences. This prompted Rohr to file a claim with the Wisconsin Department of Workforce Development. On April 18, 2012, the Sheriff's Department reversed its decision to treat the absences as unexcused and credited Rohr with FMLA leave for the January period.

Corrections officers in the Milwaukee County Sheriff's Department perform a wide variety of tasks, and the Department requires all officers to be able to perform any given task at any given time, as may be needed. However, for about a one-year period before Rohr complained about the Department's denial of her request for FMLA leave, Rohr was assigned primarily to posts that did not require frequent interaction with inmates, such as jail records, pre-booking, and release. On April 20, 2012, two days after the Department reversed its denial of Rohr's request for FMLA leave, Rohr was assigned to a work in a housing unit—a post that required frequent contact with inmates—for sixty days. The parties agree that many corrections officers dislike working in housing units. (See Def. Proposed Findings of Fact ("PFOF") ¶ 89.)

On May 1, 2012, Rohr provided the Sheriff's Department with a note from her doctor indicating that she was on medication that affected her immune system and that she should avoid contact with new inmates who could possibly be sick. Rohr's assignment to the housing unit did not satisfy this restriction. On May 3, 2012, Rohr reported to work but was advised that, given her restriction, she would not be allowed to work.

At this point, Rohr requested to be assigned to a post, such as jail records, that did not require frequent contact with inmates. The Sheriff's Department interpreted this request as a request for "light duty." However, pursuant to the Department's written light-duty policy, only employees who were recovering from temporary workplace injuries and employees who were pregnant could be placed on light duty. Employees such as Rohr, whose work restrictions stemmed from non-workplace injuries and conditions, were ineligible for light duty. Thus, the Sheriff's Department refused to modify Rohr's

assignment to a housing unit and required her to take additional FMLA leave.  Rohr took such leave from May 4 through May 10 of 2012.

On May 10, Rohr provided the Sheriff's Department with a note from her doctor that the Department interpreted as lifting her work restriction.  On May 11, Rohr returned to work and was assigned to floor control, which is a post that involved minimal contact with inmates.  However, on May 12, Rohr was again assigned to a housing unit, and when she informed her supervisor that she could not work that post with her restriction, her supervisor told her to contact human resources and sent her home.  On May 14, Rohr returned to work and was originally assigned to work in a housing unit.  But when she reminded her supervisor about her restriction, he decided to reassign her to floor control.  On May 18, Rohr was assigned to jail records, which was a post that she could perform with her restriction.

On May 22, 2012, Rohr's doctor advised the Sheriff's Department that Rohr could have contact with new inmates, but that such contact should be limited.  This clarification of Rohr's restriction was designed to make the Department aware that Rohr could respond to emergency situations requiring contact with inmates.  Thus, if Rohr was assigned to jail records, a post that normally did not require inmate contact, and a jail emergency required all officers to respond to a housing unit, Rohr could respond to the emergency.  However, for the remainder of May, June, and much of July, the Department refused to routinely assign Rohr to posts that met her restriction.  In fact, on days when Rohr would be scheduled to work posts that met her restriction, her supervisor would change the post at roll call to one that she could not perform with her restriction.  Finally, on July 11, 2012,

human resources informed Rohr that she was being removed from the schedules and should stop reporting to work.

Shortly before Rohr was removed from the schedules, she and Gibson filed the present lawsuit. In July 2012, an attorney working in the Milwaukee County Corporation Counsel's office contacted the Sheriff's Department and requested that Rohr be given a light-duty assignment. On July 26, 2012, the Department advised Rohr that she had been approved for a light-duty assignment in the communications department, which was located in a facility outside the jail. Rohr worked in communications from July 29, 2012 to January 23, 2013.

On November 15, 2012, Rohr received notice that she, like Gibson, was being transferred from the jail in downtown Milwaukee to the South facility. However, at that time, Rohr was assigned to communications and not working in any jail; thus, the transfer did not affect her daily work assignments.

On January 23, 2013, Rohr's doctor notified the Department that Rohr's restriction against inmate contact would be extended for an additional year. At this point, the Department determined that Rohr was no longer eligible for light duty and removed her from her position in communications. Because the Department refused to provide her with any other assignment that was consistent with her restriction, Rohr was unable to work. At that time, Rohr took FMLA leave and civil-service leave. When in June 2013 that leave expired, the Sheriff's Department referred Rohr to the County's Job Relocation Program, which is a program designed to match a permanently disabled County employee with a County job that satisfies his or her restrictions.

In October 2013, Sue Chase, who was on the staff of the Job Relocation Program, notified Rohr that a permanent position in the Sheriff's communications division was available. Before she could be hired for the position, Rohr had to pass a performance test. Rohr took the test in October but did not pass. Thus, she was not hired to the permanent communications position. In December 2013, Chase offered Rohr the opportunity to test for another position, known as "Clerical Assistant I," but Rohr was not available to take the test. The clerical position was kept on hold for Rohr, and Sue Chase contacted Rohr in March 2014 to see if she was available to take the test. Rohr sent Chase an email asking when the test would be held, and Chase answered this question, but Rohr did not follow up or sit for the test. Eventually, Chase determined that Rohr was not interested in finding a job through the relocation program. On March 24, 2014, Chase informed Rohr that the County was no longer offering her job-relocation services and that the County was terminating her employment.

## II. DISCUSSION

Summary judgment is required where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When considering a motion for summary judgment, I take the evidence in the light most favorable to the non-moving party and may grant the motion only if no reasonable juror could find for that party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 255 (1986).

**A.    Claims Alleged by Gibson**

**1.    Denial of a reasonable accommodation under the ADA**

Gibson contends that the symptoms associated with his migraine headaches rendered him disabled within the meaning of the ADA and that the Sheriff's refusal to allow him to work no more than eight hours per day constituted a denial of a reasonable accommodation.[1]  The defendants dispute that Gibson was disabled within the meaning of the ADA and also that, if he was disabled, he was denied a reasonable accommodation. I will assume without deciding that Gibson was disabled and focus on whether the defendants denied him a reasonable accommodation.

To be entitled to a reasonable accommodation, a plaintiff must first prove that he is a "qualified individual."  42 U.S.C. § 12112(a); Majors v. General Elec. Co., 714 F.3d 527, 534 (7th Cir. 2013) (plaintiff has burden of proof to show that he is qualified individual).  A qualified individual is a person with a disability who is able to perform the essential functions of a position either with or without reasonable accommodation.  42 U.S.C. § 12111(8).  To determine the essential functions of a position, a court may consider, but is not limited to, evidence of the employer's judgment of a position, written job descriptions prepared before advertising or interviewing applicants for the job, the work experience of past incumbents of the job, and the work experience of current incumbents in similar jobs. See 29 C.F.R. § 1630.2(n)(3); Basith v. Cook County, 241 F.3d 919, 927 (7th Cir. 2001).

_____

[1]Gibson brings a disparate-treatment claim under the ADA in addition to his claim for a reasonable accommodation.  But his disparate-treatment claim does not appear to be any different than his reasonable-accommodation claim.  See Br. in Opp. at 20–21. Therefore, I do not separately discuss Gibson's disparate-treatment claim.

The defendants contend that being available to work more than eight hours at a time is an essential function of the position of Corrections Lieutenant, and that therefore Gibson could not perform the essential functions of that job with or without a reasonable accommodation. The County's written job description for the position states that a Corrections Lieutenant must be able to work more than eight hours per day and forty hours per week. (Schmidt Decl. ¶ 8, Ex. C.) A senior commander who is responsible for oversight of the Sheriff's Detention Services Bureau states that this requirement is imposed because, at times, a Corrections Lieutenant must remain on duty past the end of his shift to deal with "emergent incidents involving inmates," including "fights, lockdowns, investigations . . . and inmate discipline," and also because a Lieutenant may need to remain on duty if an employee who is scheduled to work the next shift calls in sick. (Schmidt Dep. 57, 62-63, 73; Schmidt Decl. ¶ 15.)

Gibson does not dispute that the written job description lists the ability to work overtime as a function of a Corrections Lieutenant or that Corrections Lieutenants must sometimes remain on duty after the end of their shifts to deal with incidents involving inmates or to cover for employees who call in sick. Nonetheless, Gibson points to several facts that he contends undermine the claim that the ability to work overtime is an essential function of a Corrections Lieutenant. First, he points out that the Sheriff's Department has in the past allowed some employees to work with hours restrictions as low as three per day. The evidence he cites in support of this fact is a table prepared by his counsel that claims to summarize the work restrictions that the Sheriff's Department has accommodated in the past. (DeKosky Decl. Ex. C.) However, the table does not specify the position held by each employee with an hours restriction, and it does not show that any employee

holding the position of Corrections Lieutenant was ever allowed to continue working in that position with an hours restriction. Thus, this table does not contradict the defendants' claim that the ability to work more than eight hours per shift is an essential function of the position of Corrections Lieutenant.

Next, Gibson cites the deposition testimony of his direct supervisor, Captain Gregory Bacon, who stated that he could have allowed Gibson to work as a Corrections Lieutenant with an eight-hour restriction, so long as Human Resources approved the accommodation. (Bacon Dep. at 53–54.) But Gibson does not show that Bacon is a person who determines the essential functions of a Corrections Lieutenant or that Bacon is familiar with the reasons the Sheriff's Department requires Corrections Lieutenants to be available for overtime. And, as Bacon's own testimony demonstrates, he lacks the authority to determine whether a particular restriction could be accommodated—that is, as he put it, an "administrative call." (Id. at 16.) So although Bacon might not personally have a problem with an eight-hour restriction for one of his lieutenants, the plaintiff has not established that Bacon's personal preferences reflect the true needs of the Sheriff's Department.[2]

Next, Gibson points out that another one of his captains instructed lieutenants not to work overtime without prior authorization from a supervisor. But all this email shows is that the Department wanted to minimize unnecessary overtime. It does not suggest that

---

[2]Gibson also cites an email in which two human-resources employees indicate that Gibson could return to work with an eight-hour restriction. (Pl.'s PFOF ¶ 29.) Again, however, Gibson has not shown that these employees are authorized to determine the essential functions of a Corrections Lieutenant.

the ability to work overtime when necessary is not an essential function of a Corrections Lieutenant.

Finally, Gibson suggests that the Sheriff's Department could have accommodated his inability to work overtime by giving him shifts that were scheduled to last for only six or seven hours. That way, Gibson says, he would have had a buffer of one or two hours to respond to any possible emergencies that happened at the end of his shift. However, Gibson cites no evidence showing that this suggestion would have been feasible. He does not, for example, show that it would take less than one or two hours to respond to the kinds of emergencies cited by defendants, such as fights, lockdowns, or investigations. Moreover, Gibson's proposal does not address what would happen if the Corrections Lieutenant assigned to the next shift called in sick. In that situation, Gibson would likely be called upon to work more than an additional hour or two.

Accordingly, I conclude that the evidence in the record reveals the absence of a genuine issue of material fact as to whether the ability to work overtime was an essential function of the position of Corrections Lieutenant.[3] This conclusion is in accord with a decision from another district court, which found that overtime was an essential function of a county corrections officer. Smith v. Burlington County of New Jersey, No. 02-5581, 2004 WL 1932850, at *4 (D.N.J. July 27, 2004).

_____

[3]Gibson also contends that the Sheriff's Department failed to engage in the "interactive process" required by the ADA. See 29 C.F.R. 1630.2(o)(3). However, an employer is not required to engage in the interactive process where, as here, the employee was not a qualified individual. Id.; Spurling v. C&M Fine Pack, Inc., 739 F.3d 1055, 1062 (7th Cir. 2014). Thus, the failure to engage in that process is not a basis for imposing liability on the defendants.

Before moving on, I note that Gibson seems to contend that the Sheriff's Department would have allowed him to work as a Corrections Lieutenant with an eight-hour restriction had his restriction been caused by an on-the-job injury. However, there is no evidence in the record indicating that the Sheriff's Department would have allowed an employee with an eight-hour restriction associated with an on-the-job injury to work as a Corrections Lieutenant. Rather, the only evidence on this point indicates that a Corrections Lieutenant with an eight-hour restriction associated with an on-the-job injury could be reassigned to light duty, such as to a position in jail records. (Schmidt Dep. at 62:17 to 63:24.) I do not understand Gibson to be claiming that the Sheriff's Department should have reassigned him to some form of light-duty position that did not require availability for overtime during the times that he could not perform the essential functions of a Corrections Lieutenant. See Br. in Opp. at 42 (stating that Gibson's request to have his shifts limited to eight hours "was not a light duty request"). Therefore, I do not address whether the Department's failure to reassign Gibson to light duty was a violation of the ADA.

### 2. Interfering with FMLA rights/retaliation

The FMLA makes it unlawful for an employer to interfere with an employee's exercise of his or her FMLA rights and to retaliate against an employee for exercising his or her FMLA rights. 29 U.S.C. § 2615(a). A violation occurs if an employer takes a materially adverse action against an employee because he or she used FMLA leave. See Burnett v. LFW Inc., 472 F.3d 471, 481 (7th Cir. 2006). Gibson contends that the Sheriff's Department interfered with his use of FMLA leave and retaliated against him for using such leave by rescinding his TAHC appointment to lieutenant and taking various other adverse actions, such as transferring him to the South facility.

I begin by addressing whether the defendants rescinded Gibson's TAHC appointment because he used FMLA leave. The defendants claim that they rescinded the TAHC because of performance reasons and because Gibson's appointment had already exceeded the time allowed by County ordinance. The decision to rescind Gibson's TAHC was made by Nancy Evans, who at the time was a major in the Detention Services Bureau.[4] Evans states that she rescinded Gibson's TAHC because of Gibson's "questionable leadership skills, his lack of ability to think on his feet to make quick decisions, and in one instance in particular, he lacked the common sense to contact a supervisor when an officer was assaulted." (Evans Decl. ¶ 5.) Evans also notes that Gibson's TAHC had lasted longer than 180 days, which exceeded the time allowed under the County ordinances. (Id. ¶ 6.) Evans denies that Gibson's attendance or FMLA usage entered into her decision to demote him.

There is a genuine issue of fact as to whether the length of Gibson's TAHC appointment had anything to do with his demotion. Although it is true that by the time Gibson's TAHC was rescinded he had been serving his temporary appointment for longer than the 180 days authorized by County ordinance, the evidence in the record indicates that the Sheriff's Department routinely ignored this time limitation. First, in January 2012, the Sheriff's Department renewed Gibson's TAHC for a second time, which by itself resulted in Gibson's serving his temporary appointment for longer than 180 days. Had the Department been concerned about the time limit, it likely would have at that time either terminated Gibson's TAHC or obtained approval from the County Board to retain Gibson

---

[4]Technically, Evans only recommended to a superior officer that Gibson's TAHC be rescinded. But her recommendation is what resulted in Gibson's demotion.

in his position for more than 180 days.  Second, Gibson testified that it was "common practice" for the Sheriff's Department to allow employees to remain in temporary appointments indefinitely, despite the 180-day limitation in the County ordinances.  (Gibson Dep. at 18.)  I also note that Evans does not say in her declaration that Gibson was demoted <u>because</u> his temporary appointment had exceeded 180 days.  Rather, Evans merely notes that the appointment had exceeded 180 days and cites performance issues as the actual reason for his demotion.  (Evans Decl. ¶¶ 5–6.)  Thus, a reasonable jury could conclude that the length of Gibson's TAHC appointment did not play a role in the decision to demote him.

A reasonable jury could also conclude that Gibson's FMLA usage was the cause of his demotion.  When Evans was reviewing the performance of Gibson and other individuals who had been temporarily appointed to lieutenant for the purpose of determining whether their appointments would continue, she solicited input from other supervisors.  One of Gibson's supervisors, Captain Bonnie Crissey, provided the following assessment of Gibson:

> Really not an asset.  He is an ineffectually [sic] supervisor—more so because he can't even talk about attendance issues with his mentees since he has so many of his own.  He has one [attendance] incident on the books and has called in for FML the past two days—if not approved then a second incident.  Since January 8, 2012 he has worked 16 out of a possible 45 days—the rest were FMLA related.  And prior to that he was out an addition [sic] 2 months on FML—for "uncontrollable migraines."

(DeKosky Decl. Ex. N at LM028190.)  This assessment suggests that the sole or primary reason Gibson was viewed as a poor lieutenant was his use of FMLA leave.  Although Evans denies relying on Crissey's assessment in deciding to rescind Gibson's TAHC, a reasonable jury could find to the contrary, especially since Evans does not point to any

15

performance assessments from other supervisors that substantiate her statements about Gibson's leadership skills, his inability to think on his feet, and his lack of common sense. Moreover, there is evidence in the record that indicates the Sheriff's Department was generally hostile to employees who exercised their rights under the FMLA. For example, an internal email sent between high-ranking Department staff described corrections officers who used sick time or FMLA as "very low" quality individuals. (Id. at LM031256.) In contrast, the email described corrections officers who "regularly come to work" and who do not use sick time or FMLA as high-quality individuals. (Id.) Another email, authored by Richard Schmidt, encourages the human-resources department to "challenge" individuals who are on FMLA leave. (Id. at LM025738.) Further, an internal memorandum regarding "personnel issues" references an "emphasis" on reducing FMLA "abuse" by corrections officers. This memorandum does not precisely explain what is meant by "abuse," but the context of the memorandum suggests that any use of FMLA time will be viewed by the Department negatively. (Id. at LM025976.) Other inter-departmental emails indicate that FMLA usage is often considered by superiors when determining whether an officer will receive a particular assignment. (Id. at LM021508 (asking that Gibson not be placed in an assignment because "[h]e has a very long history of taking sick time and FMLA"); id. at LM027967 (noting "concerns" with certain officers who "frequently use FMLA"). Finally, other former corrections officers, including those who held supervisory positions, have submitted affidavits in which they state that the Sheriff's Department would routinely discourage FMLA use by corrections officers and consider FMLA use in making promotion

and assignment decisions.  (See DeKosky Decl. Exs. E–I.[5])  Thus, a reasonable jury could

conclude that Gibson's TAHC was rescinded because the Department viewed him as

taking "too much" FMLA leave.

As noted, Gibson contends that the defendants took other adverse actions against

him because he used FMLA leave, such as transferring him to the South facility and giving

him less desirable assignments.  However, it is not clear that any of these actions could

support freestanding claims for relief, as they did not affect Gibson's pay or other benefits,

and Gibson does not identify any relief he believes he would be entitled to should he prove

that the transfer or other actions constituted interference or retaliation.  In any event,

because I have already determined that Gibson can proceed to trial on his interference and

retaliation claim, I will not separately address whether actions such as the transfer could

support freestanding claims under the FMLA.

## B.    Claims Alleged by Rohr

### 1.    Denial of a reasonable accommodation under the ADA

Rohr contends that the symptoms associated with her autoimmune disorder

rendered her disabled within the meaning of the ADA and that the Sheriff's refusal to allow

her to work in light-duty assignments when needed constituted a denial of a reasonable

---

[5]The defendants contend that one of these affidavits—Exhibit E, which was submitted by Keona Garth-Dickens—should be struck because plaintiffs did not disclose it in discovery.  However, the defendants do not identify any prejudice that they have suffered from plaintiffs' failure to disclose the affidavit, and therefore I do not see a basis for striking it.  See Fed. R. Civ. P. 37(c)(1) (failure to disclose or supplement will prevent party from using evidence unless failure was harmless).  In any event, even if I struck Garth-Dickens's affidavit, it would not change the outcome of the motion for summary judgment, as the Gibson's remaining evidence would be sufficient to create a genuine issue of fact as to the reason for his demotion.

accommodation.[6]   The defendants do not dispute that Rohr was disabled within the meaning of the ADA.   However, they contend that they did not deny her a reasonable accommodation.

The defendants contend that Rohr was not a "qualified individual" within the meaning of the ADA because she could not perform the essential functions of a corrections officer so long as she needed to avoid contact with inmates.   However, there is no dispute that if Rohr's need to avoid contact with inmates had been a temporary condition associated with a workplace injury or pregnancy, the Sheriff's Department would have reassigned her to a light-duty assignment that met her restriction pursuant to its light-duty policy.   Indeed, the Sheriff's Department has frequently placed corrections officers who needed to avoid contact with inmates in light-duty assignments.   (DeKosky Decl. Ex. C (table showing that, in a two-year period, the Sheriff's Office placed six corrections officers in light-duty assignments because of restrictions requiring no inmate contact or limited inmate contact).)   Thus, the question presented is whether the ADA requires the Sheriff's Department to make its light-duty program available to persons with disabilities that are not associated with an on-the-job injury or a pregnancy.

It is well established that employers are not required to make light-duty positions that they reserve for workers with temporary restrictions available to disabled employees who require permanent accommodations.   Watson v. Lithonia Lighting, 304 F.3d 749, 752 (7th Cir. 2002); Hendricks-Robinson v. Excel Corp., 154 F.3d 685, 697–98 (7th Cir. 1998);

_____

[6]Rohr, like Gibson, brings a disparate-treatment claim under the ADA in addition to a claim for a reasonable accommodation.  But again, the disparate-treatment claim does not appear to be any different than the reasonable-accommodation claim.  See Br. in Opp. at 20–21.  Therefore, I do not separately discuss Rohr's disparate-treatment claim.

<u>Dalton v. Subaru-Isuzu Automotive, Inc.</u>, 141 F.3d 667, 680 (7th Cir. 1998).  Thus, to the extent Rohr claims that she was entitled to be permanently assigned to a position or an assignment that the Sheriff's Department had set aside for workers recovering from temporary conditions, her claim fails.  However, the ADA does require employers to make temporary light-duty assignments and positions available to persons who are disabled and who require only temporary accommodations.  <u>Dalton</u>, 141 F.3d at 680 ("The ADA does require that [an employer] make its light-duty program available to disabled employees who are recuperating from temporary restrictions and are otherwise qualified to participate.");

EEOC Enforcement Guidance: Workers' Compensation and the ADA, 1996 WL 33161342, at *12–14 (September 1996).  As the EEOC explains:

> If an employee with a disability who is not occupationally injured becomes unable to perform the essential functions of his/her job, and there is no other effective accommodation available, the employer must reassign him/her to a vacant reserved light duty position as a reasonable accommodation if (1) s/he can perform its essential functions, with or without a reasonable accommodation; and (2) the reassignment would not impose an undue hardship. This is because reassignment to a vacant position and appropriate modification of an employer's policy are forms of reasonable accommodation required by the ADA, absent undue hardship. An employer cannot establish that the reassignment to a vacant reserved light duty position imposes an undue hardship simply by showing that it would have no other vacant light duty positions available if an employee became injured on the job and needed light duty.

EEOC Enforcement Guidance, 1996 WL 33161342, at *13 (footnotes omitted).[7]  The EEOC provides the following example of this principle:

> R has light duty positions which it reserves for employees in its manufacturing department when they are unable to perform their regular job duties because of on-the-job injuries. CP, an assembly line worker, has

---

[7]The Seventh Circuit has found that the EEOC's guidance is entitled to deference. <u>See</u> <u>Hendricks-Robinson</u>, 154 F.3d at 693 n.7, 697.

> multiple sclerosis (MS) which substantially limits a number of major life activities. Eventually CP is unable to perform the essential functions of her position, with or without a reasonable accommodation, because of the MS. As a reasonable accommodation, CP requests that she be reassigned to a vacant light duty position for which she is qualified. R says that the vacant light duty position is reserved for employees who are injured on the job and refuses to reassign CP, although it would not impose an undue hardship to do so. R has violated the ADA by refusing to reassign her to the vacant light duty position.

Id.[8]   Thus, the Sheriff's Department may not refuse to place a temporarily disabled corrections officer in a light-duty assignment solely because the officer's disability does not stem from a workplace injury.

Between the period of May 1, 2012, when Rohr first notified the Sheriff's Department of her need for an accommodation, and January 2013, when the Sheriff's Department removed Rohr from her position in communications, it was believed that Rohr's need for an accommodation was temporary. (Def. PFOF ¶ 95.) The Sheriff's Department did reassign Rohr to light duty between July 29, 2012 and January 2013, and thus during this period it did not violate the ADA. However, from early May 2012 to July 29, 2012, the Department refused to provide Rohr with a temporary light-duty assignment even though

---

[8]The EEOC Guidance makes clear, however, that an employer need not convert temporary light-duty positions to permanent positions:

> If an employer has only temporary light duty positions, must it still provide a permanent light duty position for an employee with a disability-related occupational injury?
> No. The ADA typically does not limit an employer's ability to establish or change the content, nature, or functions of its positions. So, for example, an employer is free to determine that a light duty position will be temporary rather than permanent. Thus, if an employer provides light duty positions only on a temporary basis, it need only provide a temporary light duty position for an employee with a disability-related occupational injury.

EEOC Guidance, 1996 WL 33161342, at *13.

there were vacant light-duty positions, Rohr was qualified for those positions, and the Sheriff's Department could have assigned her to one of those positions without experiencing an undue burden. The Department's sole reason for refusing to provide her with a light-duty assignment between May 2012 and July 29, 2012 was that her restriction was not related to pregnancy or a workplace injury. As discussed, this is not a sufficient reason for refusing to assign a disabled employee to a vacant light-duty position. Accordingly, I conclude that the Sheriff's Department failed to provide Rohr with a reasonable accommodation between May 2012 and July 2012.[9]

In January 2013, Rohr's doctor extended her restriction against frequent inmate contact for another year. At that time, the defendants concluded that the restriction was permanent, and Rohr does not dispute that once her doctor extended her restriction for another year, she needed a permanent accommodation, not just a temporary assignment under the Sheriff's light-duty policy. Because Rohr required a permanent accommodation, the Department ended her assignment in communications in late January 2013. At this point, Rohr was forced to use additional FMLA leave and her civil-service leave. When that leave ran out in June 2013, the Department referred her to the County's Job Relocation Program.

---

[9]Although Rohr has not filed her own motion for summary judgment, I conclude that it is appropriate to enter summary judgment in her favor on the issue of whether the Sheriff's Department denied her a reasonable accommodation by not allowing her to participate in the light-duty program on a temporary basis. The outcome of that issue turns on a pure question of law—namely, whether the Department may reserve its light-duty positions for those who are injured on the job or are pregnant—that I have resolved against the defendants. Thus, there are no factual disputes that pertain to this issue that require a trial.

It is not clear why Rohr was not referred to the County Job Relocation immediately after the Department removed her from her temporary assignment in communications. Moreover, it is undisputed that when in January 2013 the Department removed Rohr from her position in communications, the Department had vacancies for officers who could perform a variety of light-duty assignments, including assignments in communications, jail records, and civil process. (Pl.'s PFOF ¶¶ 145–47.[10]) Thus, the Department had no need to remove Rohr from her temporary light-duty post in January 2013 and require her to take unpaid leave. Her occupation of a light-duty assignment was not preventing the Sheriff's Department from assigning other officers who needed light duty to such positions and was not otherwise causing the Department an undue burden. Although the Department was not required to create a permanent light-duty position for Rohr, there was no reason why she could not have remained on temporary light duty while she worked with the County Job Relocation Program to find a permanent position that accommodated her disability. Thus, I conclude that the defendants are liable for failing to provide Rohr with a reasonable accommodation for the period immediately after it removed her from her post in communications.

In the year following her removal from communications, the County Job Relocation Program notified Rohr of vacancies for two permanent positions that met her restriction. In October 2013, she was notified of an opening for a permanent position in

---

[10]The defendants have moved to strike plaintiffs' proposed findings of fact that are greater than 100, on the ground that the local rules allow a nonmovant to file only 100 additional proposed findings absent leave of court. See Civil L.R. 56(b)(2)(B)(ii) (E.D. Wis. 2010). However, I will accept plaintiffs' proposed findings even though they exceed the amount allowed by local rule.

communications.  However, Rohr failed the performance test that the County required her to take before she could be offered that job.  Later, the County notified her of a vacant clerical position that also required a test.  This time, Rohr elected not to take the test.

The facts relating to the Job Relocation Program may be relevant to the computation of Rohr's damages.  I have already determined that the Sheriff's Department denied Rohr a reasonable accommodation once it removed her from communications.  Rohr will be entitled to damages for the lost wages she incurred during the period immediately after such removal.  The facts relating to Rohr's participation in the Job Relocation Program may be relevant to the length of time for which she can recover damages.  If, for example, the County made reasonable efforts to find her a suitable permanent position and Rohr frustrated those efforts by failing or not sitting for mandatory tests, then Rohr may not be entitled to damages for the period after she failed or declined to sit for the tests.  These are matters to be resolved at trial.

### 2.    Interfering with FMLA rights/retaliation

Like Gibson, Rohr brings interference and retaliation claims under the FMLA. However, at this point, it is not clear that any of her FMLA claims could result in relief that is different than the relief to which she will be entitled in connection with her ADA claim. Accordingly, I will not address Rohr's FMLA claims at this point but will leave them for resolution during further pretrial proceedings or at trial, when Rohr identifies the precise relief she is seeking in connection with those claims.

### III.  CONCLUSION

For the reasons stated, **IT IS ORDERED** that the defendants' motion for summary judgment is **GRANTED IN PART** and **DENIED IN PART**.  The motion is granted as to Gibson's claim that he should have been allowed to work as a Corrections Lieutenant with an eight-hour restriction and to any claim by Rohr that she was entitled to be permanently assigned to light duty.  It is denied as to all other claims.

**IT IS FURTHER ORDERED** that summary judgment is entered in favor of Rohr on the issue of whether the defendants denied her a reasonable accommodation by not allowing her to participate in the Sheriff's light-duty program on a temporary basis.

**FINALLY, IT IS ORDERED** that a telephonic status conference will be held on **March 25, 2015 at 10:30 a.m.** for the purpose of scheduling further proceedings.  The court will initiate the call.

Dated at Milwaukee, Wisconsin, this 5th day of March 2015.

s/ Lynn Adelman

_____
LYNN ADELMAN
District Judge